UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION


KENNETH WAITHE and LINDA WAITHE,   :      Case No. CV409-021
Individually and on behalf of All  :
Others Similarly Situated,         :
                                   :
          Plaintiffs,              :
                                   :
vs.                                :
                                   :
ARROWHEAD CLINIC, INC., ARROWHEAD  :
MANAGEMENT, INC., HARRY W. BROWN,  :
INC., H. BROWN MANAGEMENT, LLC,    :
HARRY W. BROWN, JR., LEGAL COUNSEL,:
INC., ROBERT D. STEIN, and ROBERT  :
D. STEIN d/b/a ROBERT D. STEIN &   :
ASSOCIATES,                        :      Savannah, Georgia
                                   :      June 1, 2009
          Defendants.              :      4:02 p.m.
_____:


MOTION HEARING
BEFORE THE HONORABLE LISA GODBEY WOOD
United States Chief District Judge

_____


Reported By:              Norma Hatfield, FPR
                          Official Court Reporter
                          801 Gloucester Street, Rm. 216
                          Post Office Box 1316
                          Brunswick, Georgia 31521-1316
                          (912) 262-9989 or (912) 262-2608
                          normah3@comcast.net

APPEARANCES:


For the Plaintiffs:        BRENT J. SAVAGE, ESQUIRE and
                           JEREMY McKENZIE, ESQUIRE
                           Savage, Turner, Kraeuter, Pinckeny
                             & Madison
                           Post Office Box 10600
                           Savannah, Georgia 31412
                           (912) 231-1140
                           bsavage@savagelawfirm.net


For the Defense:           JAMES C. GRANT, ESQUIRE and
                           TRACY M. ELLIOTT, ESQUIRE
                           Alston & Bird, LLP
                           One Atlantic Center
                           1201 West Peachtree Street
                           Atlanta, Georgia 30309-3424
                           (404) 881-7000
                           jim.grant@alston.com
                           tracyelliott0@gmail.com

                           JOHN C. ROGERS, ESQUIRE
                           Carlock, Copeland & Stair, LLC
                           191 Peachtree Street, NE
                           Suite 3600
                           Atlanta, Georgia 30303-1740
                           (404) 522-8220
                           jrogers@carlockcopeland.com

                           MASON WHITE, ESQUIRE
                           Brennan, Harris & Rominger, LLP
                           Post Office Box 2784
                           Savannah, Georgia 31402-2784
                           (912) 233-3399
                           gmw@bhrlegal.com

```
 1                  P R O C E E D I N G S

 2                (Call to Order at 4:02 p.m.)

 3            THE COURT:  Good afternoon.  Call the case.

 4            THE CLERK:  Kenneth and Linda Waithe versus

 5     Arrowhead Clinic, et al.  Brent Savage and Jeremy McKenzie

 6     for the Plaintiffs; Mason White, James Grant, Tracy Elliott,

 7     and John Rogers for the Defense.

 8            THE COURT:  Are we ready for the Plaintiffs?

 9            MR. SAVAGE:  Yes, Your Honor.

10            THE COURT:  Ready for the Defense?

11            MR. GRANT:  Yes, Your Honor.

12            MR. ROGERS:  Yes, Your Honor

13            THE COURT:  I had originally had this scheduled

14     for a status conference, as you gentlemen know.  And you may

15     have a seat.  I have recently received a dozen or so

16     Savannah cases, so I came to get acquainted with each case

17     and look at the pending motions.  And I note front and

18     center pending in this case is a motion to remand.

19            Before I get to consideration of the motion to

20     dismiss and so forth, I think we need to make sure that it

21     is properly in federal court.  So we converted this

22     afternoon's session into a hearing on the motion to remand.

23            I will hear from the Movant.

24            MR. SAVAGE:  We are the Movant in this case.  To

25     quote Johnnie Cochran, "If it doesn't fit, it must acquit,"
```

 1   you have a parallel here.  You have to throw this case out

 2   if it doesn't -- I forget how I was going to have that

 3   rhyme.  I lost it there.

 4          THE COURT:  We will imagine the carefully

 5   constructed argument you have.

 6          MR. SAVAGE:  I represent the Waithes, who are the

 7   Plaintiffs in this case that was filed in the State Court of

 8   the Liberty County.  It was removed by the Defendants in the

 9   case roughly thirty days after they acknowledged service in

10   the case.

11          If there is any doubt as to whether or not this

12   Court should keep this case, then the law says that it

13   should mitigate towards remanding the case back to the State

14   Court of Liberty County.  And the burden is on the moving

15   party, in this case Harry Brown, Sr., who we have dismissed

16   from the case.  We dismissed him after they removed the

17   case, but he is no longer a party in this case because we

18   dismissed him prior to answer.

19          THE COURT:  I will tell you, Mr. Savage, what I

20   have my eye on in particular -- and I have, of course, read

21   all your submissions -- is the amount in controversy and a

22   few subset issues within that that I want to hear from you

23   on.  Let me tell you what they are, and then you can say

24   what you like.

25          MR. SAVAGE:  I'm ready to go.

1           THE COURT:  But I would invite you to focus on

2    these things.  I do want to have you address what the

3    particular standard that I look at when trying to figure out

4    whether the amount in controversy is sufficient under CAFA,

5    whether that is a legal certainty or what.  I do want to

6    hear from both parties on the standard.

7           I also want to hear your argument on whether I

8    consider the affidavits that the Defendants submitted as a

9    part of their initial removal papers.

10          And then as far as looking at and tallying the

11   amount in controversy, whenever you meet it, and whether the

12   attorneys' fees requested go into that calculus or not.

13          MR. SAVAGE:  I think they do.  We've pled it,

14   though, that there's not $5 million in controversy in the

15   aggregate in this case.  So we've agreed to cap our damages

16   at that level.  So I think we are under the level for

17   damages here.

18          THE COURT:  But it would be the Plaintiffs'

19   contention that the amount in controversy includes

20   attorneys' fees?

21          MR. SAVAGE:  Yes.  Absolutely.  They will tell you

22   that they don't think this is much of a case, that we're not

23   fighting about a lot of money; that they refunded the money

24   after they saw the affidavit of Shelah Gibbs in a related

25   case that is up in front of the Supreme Court of Georgia.

1          Shelah Gibbs is an ex-employee.  She's kind of the

2     Mark Felt of this case, the "deep throat," who used to work

3     for Harry Brown et al, and says that -- she lays out the

4     scheme that they have which is what they do is they retain

5     certain lawyers who are there to collect their bills.  And

6     then they have a scheme where the client doesn't know about

7     it as far as the volume of business that is given to these

8     select lawyers.

9          But what they do in order to collect more money --

10    and did until they saw the affidavit of Shelah Gibbs, is

11    they did this:  They would send clean bills to their select

12    lawyers, which means that they would collect money under

13    either PIP, Med Pay, or other sources.  I've given you what

14    they did up there as an example of what they did in the

15    Waithe case.  And then they paid the money back.

16          They shouldn't be talking about removal.  They

17    ought to be in jail if Miss Gibbs is correct.

18          THE COURT:  Let's go ahead to the remand issues.

19          MR. SAVAGE:  Okay.  The key is whether or not you

20    believe Brown when he -- the Defendant in the first case --

21    says he is a resident of Georgia at the time he answered the

22    case in '06, or you believe him when he gives sworn

23    testimony in this case that he has been a resident of

24    Florida since '01.  I think you've got to construe that

25    against him.

1          We put it as Exhibit 5 his answer in the case of

2    *Toler versus Brown, et al.*  Under the basic law, you

3    construe his answers against him.

4          Now Alston & Bird got him in this case.  That was

5    a poor choice of words.  I don't think that they did

6    anything other than Mr. Brown is saying that they should do,

7    or Dr. Brown, but he forgot that he had already pled in the

8    State Court in front of Judge Coolidge of Chatham County

9    that he admitted that he was a resident of Georgia in '06.

10         Now he files an affidavit in this court that says

11   -- and in his deposition -- that he was a resident of

12   Florida in '01 because they want to come to Federal Court.

13   They don't want to be in the State Court of Liberty County.

14         What I would urge you to look at is your

15   discretion in this.  First, I think they're gone under the

16   fact that there's contradictory testimony in the record from

17   Brown, Sr. who is the only basis for them to remove this

18   case to Federal Court.  He's the only basis to do that in

19   this case.

20         THE COURT:  At the time of removal, what was the

21   status of Mr. Brown?

22         MR. SAVAGE:  I guess you would say he was a

23   resident of Florida.  But that is contradicted by the fact

24   that he says that he is -- since '01, he was a resident of

25   Florida in this case.  And that's contradicted by him saying

1   that in '06 he was a resident of the State of Georgia.

2              We took his deposition on February 26th, 2009, and

3   he said he had been in the State of Georgia since December

4   20th of 2008.  We would submit to you this is a ruse because

5   they're judge shopping in this case.  That's what it's

6   about.

7              But you have discretion in this case.  Even under

8   the class action fairness standards that was put through by

9   the previous administration in the last several years, you

10  have discretion to look at these things.

11             Is this a federal case?  We're not talking about

12  any federal law in this case.  That's one of the things

13  you're supposed to look at.

14             Does this claim involve national interest, this

15  scheme that the chiropractors and the lawyers are putting

16  together here?  No.

17             Was the action originally brought to avoid federal

18  jurisdiction?  No.  We didn't bring it that way.  We

19  couldn't conceive of a way that would bring it into Federal

20  Court having known and relied on answers in the *Toler* case

21  that said he was a resident of Georgia.  We couldn't

22  conceive of a way that they could do it.

23             Does the original action have nexus with that

24  court?  I mean, this is where the whole scheme unfolded

25  where they get a call in from the Waithes, they fax to the

1    Stein Law Firm information on the Waithes without their

2    permission.  The Stein Law Firm gets a runner to go to

3    Hinesville, Georgia so that they can recruit the Waithes to

4    sign up.

5          The Waithes are hurt in a car wreck, and they're

6    told they'll get no treatment unless they sign up with

7    Stein.  Everything in this scheme occurs in Liberty County.

8    They want us to be here with no national interest or no

9    federal law involved.

10          The last thing where you have discretion is

11   whether or not the putative class are mainly Georgia

12   residents.  Maybe with a few exceptions, they're not.

13   That's why I think you have discretion to kick it out.

14          THE COURT:  Look at the declaration that the

15   Defendants provided.  They total up -- I think it is about

16   $9 million.  Why is that not correct?

17          MR. SAVAGE:  I can only tell you what they tell

18   me, that this case is not even worth my time.  I don't think

19   that the $9 million is accurate.

20          THE COURT:  What is inaccurate about it?

21          MR. SAVAGE:  If you look at Shelah Gibbs'

22   affidavit, she says that "I was the billing clerk."  What

23   they did is they really have two sections of the state.

24   They have Savannah and Atlanta.  She said, "We had more than

25   a million dollars of these overpayments where we pocketed

1   money from the insurers but never showed the client that we

2   were pocketing the money, the chiropractors in this case.

3           She estimates that amount at about a million -- a

4   little north of a million.  She estimates, I think, $234,000

5   in overpayments in the Savannah section.  They can't make

6   payments back in the Atlanta section very well because

7   they've swept up their books.

8           In Savannah, they've made payments back once they

9   see Gibbs' affidavit.  And that's 234,000 bucks.  The quick

10  math will put it at a million five.  Plus, we're entitled to

11  interest on this.

12          It is the most elaborate heinous scheme done by

13  lawyers I have ever seen, and I have seen a few around here.

14          If they think it's $9 million -- I don't think

15  that jurisdictional amount controls because I think you've

16  got to look at these things.  You've got to look at the fact

17  that Brown is saying one thing in the *Toler* court and he's

18  saying another thing here.  They will point out that's not

19  when the declaration was filed.

20          They are served with the complaint on December the

21  1st, and they'll say that that service is no good.  But if

22  you look at the statute that says when you have to remove a

23  case, it says when you are served or otherwise given the

24  complaint.  That's probably not our best argument in this

25  case, but it's a setup.  They came in and said, "Well, you

1    say we can say we were served as of the 30th," and then they

2    come in and remove the case later.

3              This case has nothing to do with this federal

4    courthouse -- nothing at all.  They just want to be here.

5              THE COURT:  Let me hear from the other side of the

6    aisle, and then I will give you the last word.

7              Mr. McKenzie?

8              MR. McKENZIE:  I'm just going to sit here and stay

9    in the background --

10             THE COURT:  Moral support?

11             MR. McKENZIE:  -- with moral support is a good way

12   to put it.

13             THE COURT:  All right.  From the Defense?

14             MR. GRANT:  Your Honor, Jim Grant for the Defense

15   here.

16             What I wrote down that you wanted to talk about --

17   I'm not sure that Mr. Savage expressly addressed it, but I'm

18   happy to talk about what you were interested in.  I think

19   what you were focused on, first of all, is:  Are we under a

20   preponderance of the evidence standard or a legal certainty

21   standard given that they've said there's not more than $5

22   million in controversy in this case?

23             By the way, of course, that means they did plead

24   the case to avoid federal jurisdiction.  That's why that

25   sentence is in this case.  And there is no answer in the

1    Eleventh Circuit under CAFA.  There is pre-CAFA guidance on

2    it which suggests a legal certainty is what's required here.

3             I think we said in our papers, Your Honor, I think

4    it's the Third and the Ninth Circuit that have ruled that

5    the legal certainty standard applies when a plaintiff says,

6    "I seek no more than $5 million in a CAFA case."  But the

7    Eighth Circuit has come out to the opposite effect and has a

8    preponderance of the evidence standard in effect here.

9             If I were to guess and predict for a case to go up

10   to the Eleventh Circuit, given what the law was on non-CAFA

11   diversity of jurisdiction, I'll bet it's legal certainty.

12   But I don't know, and someone is going to argue it some day,

13   and we'll find out.

14             THE COURT:  We may find out in this case.

15             MR. GRANT:  Right.  But if I were a betting man,

16   that's where I'd put my twenty-five cents.  Absolutely.

17             I think we meet that standard.  It's why we went

18   to the lengths that we went to in this removal.  Many of my

19   removals are much more bare bones than the removal petition

20   that we filed in this case because I was concerned about

21   that very issue.

22             The second thing you've asked about which Mr.

23   Savage didn't address is -- actually, I spent a lot of time

24   in the past few days thinking about this.  It's very

25   interesting.  I think I know where Your Honor is going.

1           And that is, under Judge Tjoflat's decision in

2   *Lowery*, can you look at the Brown declaration or not?  And

3   I'll tell you, I found it over the weekend.  It's not been

4   cited.  There's a case down in Florida where a District

5   Court judge has said you cannot.  I think it was a woman

6   judge, Your Honor.  I think she said -- actually, there were

7   two decisions.

8           THE COURT:  It has to be supplied by the Court or

9   the plaintiff.

10          MR. GRANT:  Exactly.  You've got it.  And that's

11  how she read *Lowery*.

12          And I have really thought hard about this.  There

13  are two Eleventh Circuit decisions that pre-date *Lowery*, the

14  *Sierminski* -- I'm pronouncing it wrong -- and *Best Buy*.

15          THE COURT:  Right, a panel decision.

16          MR. GRANT:  Yes -- that say you absolutely can

17  look at summary judgment type evidence.

18          And in one of the footnotes in that monster of a

19  decision that Judge Tjoflat wrote -- it's forever -- he says

20  that there are some circumstances where you can look at the

21  defendant introduced evidence.  I can tell you the footnote

22  if Your Honor cares about it, but it's in there.  He talks

23  about you can actually look at contract damages and the

24  defendant could submit evidence under a contract, for

25  example.

1     So it really is an open question.  I don't

2 understand how -- and I don't think the law is to this

3 effect -- one panel can't overrule another.  So we've got

4 one panel saying in CAFA you can't look at evidence, and

5 we've got other panels saying in the old $75,000 removal

6 regime you can.  I don't know why there's a difference.

7     THE COURT:  Does the fact that one is CAFA and one

8 not change the prior panel rule?

9     MR. GRANT:  You know, what I've been struggling

10 with is:  Is there a distinction that -- of course, there's

11 a distinction.

12     THE COURT:  Right.  But does it matter?

13     MR. GRANT:  Is it a distinction with a difference?

14 I can't come up with a difference.

15     THE COURT:  What about the general policy aims of

16 CAFA versus non-CAFA cases?

17     MR. GRANT:  Of course, CAFA was meant to

18 liberalize federal jurisdiction and make it easier for a

19 defendant to remove.

20     THE COURT:  Which differs from --

21     MR. GRANT:  Correct.  It's the exact opposite.

22 And in regular old -- I'll call it $75,000 diversity

23 jurisdiction -- it's the exact opposite.

24     THE COURT:  Which may be a distinction with a

25 difference.

1          MR. GRANT:  Could be.  I hadn't thought about it

2    from that perspective.

3          One of the things that did dawn on me, though, is

4    why would it be that for the amount in controversy I can't

5    submit defendant-oriented evidence?  But what about

6    citizenship?

7          What Judge Tjoflat said is you've got to get the

8    proof from the plaintiff.  That's essentially how the judges

9    down in Florida read it.

10          Well, how am I ever going to learn from the

11    Waithes what state Attorney Stein is a resident of?  The

12    only way to prove that is through Stein.  How am I ever

13    going to learn from the Plaintiffs that there's more than a

14    hundred people in this case?  The only way to prove that is

15    through my guys.

16          The other elements you have to prove -- you can

17    have defense-oriented evidence but not the amount in

18    controversy?  I mean, again, I don't see why you would say

19    it's okay for Stein to say, "I live in South Carolina."  And

20    that doesn't come from a defendant -- I mean -- from a

21    plaintiff.  And it's okay for me to say there were

22    twenty-two hundred patients that we've looked at our records

23    that were both Arrowhead Clinic patients and represented by

24    Stein.  These folks would never know that.  They would not

25    be competent to give that proof.

1          But when it comes to what's at stake, you're
2   solely limited to look at what comes from plaintiff.  That
3   just doesn't make sense.  And none of the other circuits, by
4   the way, do that.  It's interesting.  The other circuits
5   we've seen in CAFA allow you to submit evidence from the
6   defendant in trying to establish jurisdiction under CAFA.
7          The Eleventh Circuit stands alone in this one
8   decision.  And I don't know how it stands in light of the
9   prior decisions in *Best Buy*.
10         In fact, Judge Tjoflat ironically cited in a CAFA
11  decision *Best Buy* with approval.  But he tries to
12  distinguish it by saying, "Well, we didn't confront the
13  issues squarely."  They looked at evidence, an amount in
14  controversy in CAFA from a defendant, and said it's
15  insufficient.  But nobody raised:  Was it proper to do this?
16  But they tacitly approved that procedure, but it wasn't hit
17  square on.
18         But there's a decision under CAFA looking at
19  defendant-introduced evidence.  I can tell you what it is
20  right now.  It is the *Evans* case, Your Honor -- we cited it
21  to you -- where they do that -- excuse me.  It's the *Miedema*
22  case -- *Miedema*.  And we cited that case to you.
23         And they look at, "Defendant introduced evidence
24  on the amount in controversy under CAFA," and cite *Best Buy*
25  with approval.

1           So being completely straight with Your Honor, it's

2    confusing admittedly.  I think what we're saying is the

3    better side of this and the right way to look at it from a

4    consistency standpoint is if you can introduce evidence on

5    citizenship or the number of plaintiffs, and you can do so

6    in the old diversity context, why in the world would there

7    be this little exception for the $5 million issue under

8    CAFA.

9           I think the weight of authority is with us on

10   that.

11          THE COURT:  Assuming that we do consider the

12   affidavit then, help me line up what it enumerates with what

13   the Plaintiff is actually seeking.

14          MR. GRANT:  Okay.  Sure.

15          THE COURT:  Because I am not sure that there is

16   necessarily such a fit.

17          MR. GRANT:  Okay.  There's two classes in this

18   case.  Mr. Savage devoted most of his comments to this Class

19   B, which has to do with the monies my clients allegedly held

20   on to too long and then refunded after the fact and some

21   interest claims.

22          There's also class A.  If you read the prayer for

23   relief in the original complaint, he seeks disgorgement of

24   all attorneys' fees and all medical payments.  If you look

25   at the actual prayer for relief, that is on page 14 of the

1    original complaint.  That's what it seeks as a remedy in

2    this case.

3            And that's why we say, "Okay.  If you seek

4    disgorgement" -- there were $9 million in medical payments

5    to all these folks.  That's our first example we gave you in

6    the affidavit that were both clients of the Stein firm and

7    patients of Arrowhead.  That's example or bucket one.

8            Bucket two was:  Well, what about the folks that

9    have resolved their personal injury case, which is a subset

10   of that nine?  Those folks, where they've resolved their

11   personal injury case and have payments to the Arrowhead

12   Clinics, is $7.3 million.

13           Then when you talk about what's the actual funds

14   received by my clients in those resolutions, it's $3.1

15   million.  That's the third example where we do have to go to

16   aggregation which Your Honor was asking about earlier.  I do

17   think the law is fairly clear -- and Mr. Savage admitted as

18   much -- that you put in attorneys' fees and you can

19   aggregate punitive damages which they also seek.

20           And you remember, I'm sure, Your Honor, from your

21   days when you were, long ago, a practicing lawyer, that the

22   Supreme Court of Georgia long ago ruled under the *Bagley*

23   *versus Short* decision that the $250,000 cap is per

24   plaintiff.  So there's not an issue that it would only be a

25   $250,000 award.

```
 1              And we've got at least 1,700 patients, according
 2    to the Brown declaration, at issue.  If they just got a
 3    thousand dollar punitive damage award, that's $1.7 million.
 4    If they get a two thousand dollar punitive damage award,
 5    that's $3.4 million.
 6              I mean, you don't have to conjure up images of a
 7    run-away wacky punitive damage award to aggregate with some
 8    modest attorneys' fees plus the $3.1 million that was paid
 9    to my clients through resolution of these personal injury
10    claims to easily exceed the $5 million threshold.
11              We don't have this proof.  So I recognize, Your
12    Honor, that this is silent in the record.
13              But let me just make a footnote.  They're also
14    seeking disgorgement of the lawyers' fees.  Now there is no
15    proof in front of you, but that's at stake too, and that's
16    going to be a lot of dough as well.  I think we get there on
17    our proof alone, of course.  That's just disgorgement of the
18    medical payments.
19              But they're also seeking disgorgement of the fees
20    that they paid to Stein.  The example here with the Waithes
21    was about four thousand dollars, I think, three thousand
22    dollars to four thousand dollars for Mrs. Waithe and three
23    to four thousand dollars for Mr. Waithe.  Times seventeen
24    hundred Plaintiffs.  Again, you're up into the multiple
25    million dollars range without really batting an eye.
```

 1          So I think, going back to where we started, that

 2    when and if the Eleventh Circuit gets around to deciding

 3    this legal certainty, it's probably going to say that that's

 4    the burden we're in here on today.  I think we, on purpose,

 5    assumed that and submitted proof to try and chin to that

 6    burden.

 7          I think that reconciling *Lowery* with *Sierminski*

 8    and *Best Buy* in the other circuits, it is appropriate for

 9    Your Honor to consider the declaration.  The diversity of

10    citizenship issue is a non-issue.  Post-removal acts don't

11    matter, and Stein is diverse anyway.  He's a South Carolina

12    citizen.  Whether Brown is Florida or Georgia, Stein is from

13    South Carolina and the Waithes are from Georgia.

14          So we only need minimal diversity.  I think that's

15    kind of a red herring candidly, Your Honor.  That's what

16    CAFA requires.

17          Last but not least, this discretionary local

18    controversy exception that exists in the statute, unlike the

19    burden I bear, they bear that burden.  And they've got to

20    show the states from which more than one-third but less

21    two-thirds of the class members resided.

22          And there's case law in Georgia -- excuse me -- in

23    the Eleventh Circuit already.  We've cited it to Your Honor.

24    And they find that the Plaintiffs have not met their burden

25    because it's rank speculation about where, for example, the

1    citizenship is of Plaintiffs.  And this record is absolutely

2    silent on that issue.  It's silent on all of those issues,

3    candidly.  But it's silent on that very simple what is the

4    one-third/two-thirds shake out of the Plaintiffs' proposed

5    class.

6              So unless Your Honor has additional questions, I

7    will just close with that.  I think that --

8              THE COURT:  Disgorgement of the medical liens

9    alone for the Class A represents how much?

10             MR. GRANT:  $9 million.

11             THE COURT:  Without the attorneys' fees?

12             MR. GRANT:  Nine or seven -- oh, I'm sorry.  $3.1

13   million.  $3.1 million.

14             Well, if it's a medical lien, 3.1 is the money we

15   got.  The charges were 9 million for everybody, 7 million

16   for those who resolved their claims.  So it could easily be

17   the seven and the nine.

18             THE COURT:  But let's look at legal certainty.

19   You are certain of 3.1 million in controversy?

20             MR. GRANT:  Absolutely.  That's cash.  That's

21   cash.

22             THE COURT:  How do you get the remaining 1.9 to a

23   degree of legal certainty?

24             MR. GRANT:  Fees and punitive damages.  Under

25   removal jurisprudence, you have to assume the Plaintiff is

1   going to win.  I get that presumption in my favor.

2           Well, to get that presumption, it's not very hard

3   to assume that a one-third attorneys' fee is a million

4   bucks.  It's probably higher, although I don't have his fee

5   contract.

6           I gave you two examples.  $1,000 or $2,000 per

7   Plaintiff in punitive damages.

8           THE COURT:  That is a rational estimate that you

9   are giving?

10          MR. GRANT:  Yes, ma'am.

11          THE COURT:  But, again, if the standard is legal

12  certainty, how do we --

13          MR. GRANT:  But I don't know how I could ever do

14  that as a Defendant.  You're never going to know to a legal

15  certainty until a jury awards those punitive damages.

16          THE COURT:  Well, you would do it, for example, if

17  disgorgement had been 6 million as opposed to 3.1.

18          MR. GRANT:  Yes.

19          THE COURT:  Then you would file your affidavit

20  with your removal papers and the affiant would swear that it

21  was $6 million, and that would be a legal certainty.

22          Here we have a 3.1 million legal certainty for

23  disgorgement.  My question is:  How do you bridge the gap,

24  the difference, between 5 and 3.1 to a legal certainty?

25          MR. GRANT:  Understood.  For purposes of today, I

1    don't know what I can -- with respect to punitive damages, I

2    don't know how I could ever have proof to a legal certainty,

3    other than that they're sought.

4              THE COURT:  The answer may be that you may not --

5    you, particularly.  But there could be a defendant who has

6    the capacity.  Like I just said, if it was $6 million in

7    disgorgement.

8              MR. GRANT:  Absolutely.  I'm saying if I'm in the

9    $3.1 million bucket and I need the punitive damages -- I

10   can't say six, for example -- I'm not sure how to a legal

11   certainty you can other than be rational because how do you

12   know, right?

13             THE COURT:  You may not be capable of showing it

14   to a legal certainty.

15             MR. GRANT:  In that particular bucket.  But they

16   seek disgorgement of the medical liens.  Those are going to

17   be for the services rendered, not just the cash that changed

18   hands between the Stein firm and the Arrowhead Clinic.  And

19   that's either the $7.3 million number or the $9 million

20   number.

21             Now if they want to change their prayer for

22   relief -- well, they can't do that either because it's time

23   of removal that is the snapshot in time that we're looking

24   at.  And the law is very clear on that.

25             As an aside, they fought this fight.  We only did

1    the appeal of the underling State Court case.  And they

2    sought disgorgement in the State Court case and the

3    companion one that preceded this as well until they

4    dismissed it because of jurisdictional reasons in the State

5    Court.

6              THE COURT:  Do you have your affidavit handy?

7              MR. GRANT:  Yes, I do.

8              THE COURT:  Let me take a look.

9              MR. GRANT:  (Hands document)

10             THE COURT:  (Pause)  Let me ask you about, in

11   specific, Paragraph 7 that says, "I have determined that the

12   medical bills incurred by these patients to ACI to date

13   total 5,698,000."

14             MR. GRANT:  Yes.

15             THE COURT:  Does that figure line up with the

16   prayer for relief of the Plaintiff?

17             MR. GRANT:  I would contend that it does.  The

18   reason it's not matching the nine and seven we were talking

19   about is because they've got one entity that's the Savannah

20   clinics and one entity -- they sued both of them -- but it's

21   Atlanta.  You've got to total those two together.  But

22   that's the overall amount of bills which totals to the $9

23   million.  It's 5.6 plus -- I'd have to look at another

24   number in here.  It's Number 10, Your Honor.

25             It's ACI and HWBI that are the two entities.  One

1   holds the Savannah clinics and one holds Atlanta, both of

2   whom are Defendants here, and they seek class certification

3   with respect to both.

4                THE COURT:  All right.

5                MR. GRANT:  Thank you, Your Honor.

6                THE COURT:  Thank you.

7                All right, Mr. Savage?

8                MR. SAVAGE:  That was as well as I've seen.  I'm

9   fifty-six and I've seen a lot of it.

10               It is a little frustrating that people aren't more

11  outraged by this behavior.  I guess I'm not a legal scholar,

12  but in reading Judge Tjoflat --

13               THE COURT:  We will get to the actual behavior

14  later.  Right now we are just deciding where to adjudicate.

15               MR. SAVAGE:  Right.  They want to be here, and

16  they want to be in Federal Court, and they don't want to be

17  where all this happened.

18               They say that the amount that they received was

19  $3.1 million.  We get removed incredibly when we trust a

20  guy's answers -- or answer to a lawsuit in the *Toler* case

21  that he's a Georgia resident.  And then we get handcuffs put

22  on us.

23               We have done no discovery in this case.  So we're

24  taking Harry Brown who says, "Well, I've had pleadings that

25  I submitted in State Court," which still counts, "that says

1    I was a resident in Georgia in '06.  But then I go back to

2    Alston and Bird and I get them to sign an affidavit that's

3    presented that I was really a resident of Florida since

4    '01."

5            So you want to trust that and you want to have --

6    in this case, the Plaintiffs have no ability to do any

7    discovery because it was all shut down.  We took Brown's

8    deposition only to look at what he said in his affidavit.

9    And, basically, he said, "I don't know anything about

10   anything."

11           THE COURT:  Do you not have diversity with Stein

12   anyway?

13           MR. SAVAGE:  But Stein is not the person who

14   caused the removal to take place.  I don't know what this

15   discretionary stuff means.  Mr. Grant was as good as I have

16   ever seen on his feet, and I'm probably not a good lawyer to

17   oppose those things.

18           But I do hope that in a fact situation people

19   understand what they are permitting to do in this case and

20   that that is repugnant.

21           I represented the guy on the back of the phone

22   book here, and Judge Edenfield took it to the State Bar

23   after we got done here.  These things are awful.  If they

24   want to drag their client through all these appellate

25   courts, then I guess they can saying that "We do these deals

1    where we have collections made on the side."

2              THE COURT:  Again, Mr. Savage, we are going to

3    look at remand issue right now and the law on it.

4              You heard counsel argue as to how they get to the

5    5 million.

6              MR. SAVAGE:  They say in their own affidavit that

7    they received $3.1 million.

8              THE COURT:  Is all you request what they have

9    received?

10             MR. SAVAGE:  And my attorneys' fees at a third.

11   I'm not in there doing a 50 percent deal.  And if they've

12   got to prove it with legal certainty, I think they've got to

13   have actual hard damages that are outside above that 5

14   million bucks.

15             THE COURT:  Your contention would be that they

16   have 3.1?

17             MR. SAVAGE:  Times a third.

18             THE COURT:  And then at most a third --

19             MR. SAVAGE:  I can do that math real quick.

20             THE COURT:  4.1.

21             MR. SAVAGE:  Right.

22             THE COURT:  Less than five.

23             MR. SAVAGE:  It is.  But I want to get going one

24   way or another.

25             THE COURT:  Is there anything else that you

1    request other than that 3.1 and your one-third.

2            MR. SAVAGE:  No, I'll request punitive damages.  I

3    don't know what I'm going to get, though.  That's hardly a

4    legal certainty.  I don't know that I've collected punitive

5    damages in thirty-one years of doing this.  They're hardly a

6    legal certainty.

7            THE COURT:  Their standard is not a legal

8    certainty that you would recover, but a legal certainty that

9    what you seek is $5 million or more.

10           MR. SAVAGE:  I don't know what I'm going to get.

11   I don't know how you could ever do that.  I did like your

12   argument which was better phrased than mine.

13           You guys are playing in a different league than

14   mine.  I am playing just from a fact issue, and I want

15   somebody to feel what happened to these people.

16           THE COURT:  That is the next phase when we look at

17   it.  We are just trying to figure out if it is here or

18   across the street.

19           MR. SAVAGE:  It's about forty miles from here.

20           THE COURT:  Anything else other than what you have

21   already argued regarding the remand?

22           MR. SAVAGE:  No, I'm not pandering to the Judge.

23   I think you're fair-minded and you're a lot smarter on these

24   things than I am.  You will figure it out and do what you

25   think is right.

1    I want to get going on these things and let them

2    figure out how they are going to defend the facts in the

3    case.

4              THE COURT:  Anything further from the Defense?

5              MR. GRANT:  I guess I've got a freebie there.  I

6    now have proof of the third that I didn't have before.

7              So we're at $4.1 million.  Whatever $900,000

8    divided by 1,700 is -- that's about $500 or $400 in punitive

9    damages is what it would take to be above $5 million, if I'm

10   doing my math with my mental calculator right in my head.

11             It's an interesting question Your Honor poses

12   about punitive damages and legal certainty.  I do get to

13   aggregate them.  That's clear.  I don't know that any of us

14   have at our fingertips how you do that other than to come up

15   with a rational basis for saying it's not irrational to

16   think in a case like this that each Plaintiff would be given

17   more $500 in punitive damages.

18             I think that, with my third bucket of the 3.1,

19   gets us above $5 million.  But then we have the seven and

20   the nine, and I won't belabor that any more.

21             THE COURT:  All right.  Counsel, thank you.

22        (Recess at 4:36 p.m.)

23

24

25

```
1                        CERTIFICATION

2

3          I certify that the foregoing is a true and correct

4   transcript of the stenographic record of the above-mentioned

5   matter.

6

7

8

9   _____     May 8, 2012
    Norma Hatfield, FPR, Court Reporter
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```